## Van Schoiack, Appellant, *v.* United States Liability Insurance Company.

Argued June 3, 1957.  Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

*Theodore R. Gardner,* with him *James L. Weirbach,* for appellant.

*James D. Christie* and *Harry A. Dower,* with them *Walter E. Knecht, Jr., Perkin, Twining & Dower* and *O'Keefe & Knecht,* for appellee.

Opinion by Mr. Justice Chidsey, June 28, 1957:

This is an action in assumpsit brought by the plaintiff against the defendant insurance company seeking an accounting to determine the amount of commissions allegedly due under the agency agreement between them.

Plaintiff, the proprietor of the Emmaus Ford Company, in Emmaus, Pennsylvania, was approached during the early months of 1952 by representatives of the defendant company with a view toward having plaintiff write physical damage insurance for it as an agent of the company.  The defendant insurance company sought to interest plaintiff in writing the insurance under a so-called "retrospective" plan of compensation.  Under this arrangement the plaintiff would remit to

the defendant the full amount of the premiums he collected on policies written by him, from which the defendant company would deduct from the premiums as they became earned a stated percentage (in the case of the plan offered to plaintiff here it would be 15%) for its office fees, etc. Thereafter the defendant company would add the salvage and subrogation, and deduct the total losses and loss expenses due to these policies, and remit to the plaintiff the remainder as his compensation. If the remainder should be a minus figure in one accounting period, then the defendant company would carry that loss over to subsequent accountings. The net effect of this "retrospective" plan would be to make the agent's commissions depend on the safety record of the risks he writes. If the loss ratio of his accounts is very low, then his commission, in the instant case, would run close to 85% of earned premiums on the insurance he writes. If the loss experience is high, then his commission would suffer proportionately.

The plaintiff was new to the insurance writing business, and he preferred to be paid a straight commission, thus shifting the loss risk to the defendant insurance company. To this the defendant agreed, and on March 10, 1952 the parties entered into an agency agreement to this effect.

In his original complaint, filed May 5, 1955, plaintiff termed this arrangement an "oral agreement" under which plaintiff was to receive a 25% prepaid commission upon all the insurance he placed with the defendant company. In addition, he contended: "5. The plaintiff was, by virtue of the aforesaid agreement with the defendant, entitled to convert the business placed for the defendant to a retrospective basis with respect to compensation, upon written notice to the defendant, whereupon the plaintiff would be entitled to receive as

additional compensation the residue of premiums earned by the defendant upon expired or terminated risks less the actual loss experience of the defendant upon these risks and also less the additional sum of 15% of earned premiums to be retained by the defendant." and that on February 3, 1955, he informed the defendant company by written notice that he desired to convert his business theretofore placed to a "retrospective" basis.

His contention is that by so exercising the conversion feature on February 3, 1955 he became entitled retroactively to compensation on the "retrospective" plan basis on all of the insurance he had written for the defendant company, going back to the inception of their agency relationship on March 10, 1952.

In its original answer the defendant averred that the arrangement between the parties was based on a *written* contract executed on March 10, 1952, which did not contain a feature permitting conversion to a "retrospective" plan of compensation, but which provided only for the 25% prepaid commissions to the plaintiff.[1] As new matter it appended a printed "Agency Agreement" dated March 10, 1952, containing the signatures of the plaintiff and the then president of the defendant company, and an attached typewritten "Addendum #1", similarly dated and signed. In the margin next to paragraph (2) of this printed "Agency Agreement" form, wherein compensation to the agent is set forth according to a "retrospective" plan, there appears the following notation: "Para. #2 Waived See Addendum". In addition, the printed "Agency Agreement" contains provisions pertaining to the powers and duties of the agent and the company; provisions for

---

[1] It is undisputed that plaintiff received all of the compensation due him under the 25% clause of the contract.

termination, accounting, expenses, etc., and a statement that "(7) This Agreement supersedes all previous agreements whether oral or written between the Company and Agent. . . .".

The "Addendum #1" contains a single provision:

"Paragraph 2, is eliminated and the following is substituted: The Company agrees to pay the Agent as full compensation on business so placed with the Company a commission of 25% of the written premiums. This commission is refundable rateably to the Company on all return premiums.

"All other terms of the AGENCY AGREEMENT remain unchanged."

The plaintiff's reply to new matter admitted the existence of the agency agreement with addendum attached, but averred that "there exist two additional contemporary writings, business letters, referring to the proposed agency agreement and forming a part thereof.". The trial judge found that these two writings, although dated differently than the "Agency Agreement" and "Addendum #1", were in fact forwarded together with them to the plaintiff by the defendant company. These two writings read:

"March 6, 1952

"Dear Mr. Van Schoiack:

"Mr. A. R. Wenzel, has informed me of his recent visit with you and I wish to thank you for the many courtesies extended him at that time.

"In confirmation of his conversation with you, I am enclosing herewith agency agreements calling for a 25% prepaid commission.

"Also I am enclosing a separate letter to confirm the fact that if at a future date you desire to convert this contract to a retrospective agreement you may do so upon written notice to our company.

"I would appreciate if you would sign and return both copies of the agency agreement, the addendum, and the carbon copy of the letter. Upon receipt of these signed contracts, we will sign and return one for your files.

"Incidentally these contracts have been left blank as to agent's name, and I would appreciate if you would insert the name of the person who is to be licensed for this operation.

"If you have any questions whatsoever, please do not hesitate to write, or telephone me at Baldwin 3-1300.

Very truly yours,
J. F. Dalkin
President"

"March 6, 1952

"Dear Mr. Van Schoiack:

"In confirmation of our conversation regarding the signing of the agency agreement with our company, we wish to state that the business so placed under this contract may be converted to a retrospective contract upon written notice to our company.

"I would appreciate it if you would sign a duplicate of this letter, and return it to us for our files.

Very truly yours,
John F. Dalkin,
President"

An amended complaint was also filed in which the plaintiff set forth that on July 27, 1955 (almost three months after the original complaint in this suit was filed) he had received from the defendant company a "Statement of Losses Incurred" and a "Statement of Commissions" through June 30, 1955, which "statement of account" plaintiff immediately "accepted", wherefore he demanded judgment on the basis of these two

statements. Defendant's answer to this amended complaint alleged that these statements had been prepared by it for its own internal use and had been sent out by mistake through an administrative error by a new employe.[2] These statements do not bear on the interpretation of the agreement between the parties, nor on the alleged liabilities under the agreement, and therefore the trial judge did not make findings as to them. Both parties did, however, stipulate the accuracy of the earned premiums, unearned premiums, and net loss figures contained therein.

The pleadings have been recited in part for a better understanding of the case. All of the documents referred to and the admissions contained therein were introduced into evidence in connection with the testimony orally adduced by witnesses called by both sides. The case was tried before President Judge HENNINGER, sitting without a jury, who found for the defendant. Exceptions filed and argued were dismissed and judgment was entered for the defendant, from which plaintiff brings this appeal.

Although the trial judge made numerous findings, his decision was clearly based on the findings that: "The element of acceptance of defendant's offer [of] March 6, 1952 . . . has not been proved by a preponderance of the evidence.", and that "There is no proof of acceptance of defendant's written offer of March 6, 1952 within a reasonable time.".

---

[2] Harold A. Garrish, the then accountant for the insurance company, testified that he was in charge of drawing up these statements, and that they were intended for use by the officers of the company only. His assistant, Miss Madeleine M. Clarke, testified that she had been hired in June, 1955, and that she had typed these statements and had mailed them to plaintiff by mistake. "The second month I was there this one just got by. It was one of those that should have been withheld for office records. I just let it go out by mistake."

The offer in question appears to contemplate two acts by plaintiff to make it binding upon the defendant: (1) ". . . the business so placed under this contract may be converted to a retrospective contract upon written notice to our company" and (2) "I would appreciate it if you would sign a duplicate of this letter, and return it to us for our files.". No express time limits appear for the performance of the accepting acts. The Restatement, Contracts, §40, states:

"(1) The power to create a contract by acceptance of an offer terminates at the time specified in the offer, or, if no time is specified, at the end of a reasonable time.

"(2) What is a reasonable time is a question of fact, depending on the nature of the contract proposed, the usages of business and other circumstances of the case which the offeree at the time of his acceptance either knows or has reason to know."

The letter which accompanied the documents is instructive in this regard:

". . . I am enclosing a separate letter to confirm the fact that if at a future date you desire to convert this contract to a retrospective agreement you may do so upon written notice to our company.

"I would appreciate if you would sign and return both copies of the agency agreement, the addendum, and the carbon copy of the letter. Upon receipt of these signed contracts, we will sign and return one for your files."

It is obvious that the signing and return of the letter was to be done contemporaneously with the signing and return of the "agency agreement" and "addendum", and that a "reasonable time" for compliance with this term, "sign and return", would be a few days at most; while a "reasonable time" for the conversion "at a fu-

ture date" contemplates some time in the future more difficult to ascertain.

The evidence is clear that the "agency agreement" and the "addendum" attached thereto were signed and returned to the defendant. Not so the return of the carbon copy of the letter. No copy of that letter signed by the plaintiff was introduced into evidence. There was testimony that no such copy appeared in defendant's files. It is of course possible that the copy was lost or misplaced and also possible that plaintiff never signed and returned it. Still this does not obviate the necessity of plaintiff's proving by a fair preponderance of the evidence that the copy of this letter was signed and returned. The then president of the defendant company testified that he did not recall receiving from plaintiff a copy so signed. The then special representative of the defendant company, with whom plaintiff had most of his dealings, categorically denied knowing of the existence of either of the letters until January of 1955, and he testified that he had access to the company's files and had searched them for the copy of the letter in question without success. Plaintiff's testimony as to signing and sending the copy of the letter was as follows: "Q. Did you sign a copy of those letters? A. I assume that I did, Mr. Dower. By Mr. Dower: I object to that. By the Court: The objection is overruled. Do you know whether you signed a copy? That's Mr. Dower's question. A. I don't know, Your Honor, more than I know whether I signed these or not, but they were all in the same lot. I signed these because these are copies they had. I must have signed the others. I sign a lot of papers during the course of a day. I can't remember signing each individual one because I can't remember actually signing these. Q. Mr. Van Schoiack, to the best of your knowledge, and remember you're under oath, did you sign a copy of the

letters which have been identified as Plaintiff's Exhibits 'B' and 'C'? A. Mr. Dower, the only way I can answer that, sir, to the best of my knowledge I did. I have no clear-cut remembrance of signing the letters or of signing these. Q. Now, I believe you said—A. But I know I did."

And later, on recall: "Q. You hadn't signed it and returned it either, had you? A. Yes, sir. Q. You had? A. Signed it and returned what, Mr. Dower? Q. Copy of the letter. A. So far as I know, yes, sir. Q. So far as you know? A. Yes, sir. . . . Q. Mr. Van Schoiack, do you recall that your depositions were taken in this matter on Thursday, October 6th, 1955, at the office of the United States Liability Insurance Company in Philadelphia? A. Yes, sir. Q. Referring to page 18 of those depositions, just below the middle of the page where there had been some question to you concerning whether or not you had signed and returned a copy of the letter, the question, second question on the page, the question was: 'I believe your statement has been that you assume that you signed this letter, is that correct?' Your answer was, 'That is correct.' 'Q. Signed a duplicate of it?' 'A. Duplicate.' 'Q. You are not positive?' 'Answer'—These are your answers—'I do not recall signing it sir. I can only assume that I did. I do not have a copy of the letter. I don't know where a copy of it would be. I only can assume that I signed it and returned it.' 'Q. And you assume also that you returned it?' 'A. Yes, sir.' A. Yes, I believe that's the testimony I gave. Q. Is that testimony true at that time? A. Yes, sir."

If the testimony of the plaintiff, equivocal at best, be interpreted as a declaration by him that he had in fact signed and returned the copy of the letter, then this aspect of the case is reduced to a simple conflict in the evidence as between him and the officers of the

defendant company. In such a situation the credibility of the witnesses is the determinative factor, and where credibility is in issue the determinations are for the trier of the facts who had the opportunity to personally see and hear the witnesses. See *Werle v. Werle,* 332 Pa. 49, 1 A. 2d 244; *Commonwealth ex rel. Harry v. Eastridge,* 374 Pa. 172, 97 A. 2d 350; *Glenn v. Trees et al.,* 276 Pa. 165, 120 A. 109. The trial judge found for the defendant in this regard. We have scanned the record with care, and we conclude that the trial court did not err in concluding that plaintiff had failed to prove the signing and mailing of the copy of the letter in question by a fair preponderance of the evidence.

But plaintiff contends that notwithstanding an adverse finding as to plaintiff's conformity with the "request for acknowledgment", his right to accept the conversion feature sometime in the future was unaffected, because the contract as a whole was a single contract to which both parties agreed, and the option to convert was simply a part of that binding contract.

With this contention we cannot agree. First, because the "Agency Agreement" and the "Addendum #1" attached thereto, together make a clear integrated contract, and as such should be interpreted within the four corners thereof since it is unambiguous. This agreement and its addendum are clear within their own terms, and the only reference to other "agreements" is to declare them superseded. Therefore if the letter is considered at all, it can be considered only as a separate collateral option.

Second, to read the letter as an integral part of the agency contract would render nugatory the defendant's request for a signed duplicate of the conversion option letter. We cannot ignore these words. It is settled law that the offeror is the master of his offer, and his provision as to time, place and manner or mode of ac-

ceptance must be complied with: 12 Am. Jur., Contracts, §44. Plaintiff would have us consider the request for an acknowledgment as a mere nullity. There is a sound business reason why this requirement for an acknowledgment "signed and returned" had vital importance to the defendant. Assuming that the option to convert was to be open for some time "in the future", defendant had to be on notice (assuming plaintiff's interpretation of the effect of a conversion to a retrospective plan) to have a reserve amounting to several thousand dollars set aside, and not distributable as earnings in the form of dividends, etc., in case plaintiff exercised the option thus open to him. It was a wholly understandable and reasonable request, and absent compliance with the "sign and return" term, no option contract can be said to have come into existence.

Furthermore, even if it were decided that plaintiff had in fact complied with the "sign and return" term, or that such compliance was unnecessary, we still could not find for plaintiff. The trial judge found that the purported acceptance of the conversion option had not been communicated within a "reasonable time". As the Restatement, Contracts, §40 (2), quoted supra, points out, a "reasonable time" depends on the "nature of the contract proposed, the usages of business and other circumstances of the case. . . .".

The trial judge found that a period of almost three years before written "acceptance" was communicated to the defendant was beyond a reasonable time, and was thus ineffective to bind the "offeror". We think the judge was entirely justified in this conclusion. The "option", if interpreted as plaintiff would have it, had the effect of guaranteeing to plaintiff a profit of 25% on all earned premiums he had written, and, in addition, give him the benefit of a favorable loss ratio, without incurring the risk of an unfavorable loss ratio.

We could possibly understand such an arrangement for a short period of time, especially in the case of a new agent who had no experience upon which to base his immediate decision, but a period of three years during which the insurance company is a complete insurer not only of the insured, but of the extra "good risk" profits of the agent as well, is beyond that which the usage of business or the contract in this case would reasonably contemplate.

The plaintiff received the 25% commission to which he was entitled on all policies written by him, and the court properly decided that he was not entitled to any commissions calculated on the so-called "retrospective plan".

Judgment affirmed.